IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| James Charles Seabrook, | ) | C/A No.: 1:15-1308-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.      Relevant Background

        A.      Procedural History

On February 15, 2011, Plaintiff filed applications for DIB and SSI in which he alleged his disability began on December 16, 2009. Tr. at 180–85, 186–92. His

applications were denied initially on June 10, 2011. Tr. at 92–95. The record does not reflect that Plaintiff appealed the initial determination. Plaintiff protectively filed applications for DIB and SSI on December 12, 2011, and alleged his disability began on June 1, 2009. Tr. at 66, 67, 193–201, 202–03. His applications were denied initially and upon reconsideration. Tr. at 99–103, 104–08, 111–12, 114–15. On September 11, 2013, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Roseanne P. Gudzan. Tr. at 28–44 (Hr'g Tr.). The ALJ issued an unfavorable decision on October 23, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 7–27. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on March 20, 2015. [ECF No. 1].

    B.    Plaintiff's Background and Medical History

        1.    Background

Plaintiff was 46 years old at the time of the hearing. Tr. at 31. He completed high school. *Id.* His past relevant work ("PRW") was as a bus driver and a garbage truck driver. Tr. at 41. He alleges he has been unable to work since February 19, 2011.[1] Tr. at 33.

---

[1] Plaintiff's representative moved to amend his alleged onset date from June 1, 2009, to February 19, 2011, in the pre-hearing brief. Tr. at 337.

2.      Medical History

Plaintiff presented to the emergency room ("ER") at St. Francis Hospital on April 6, 2010. Tr. at 392. He indicated that he had experienced increasingly severe lower back pain that radiated into his bilateral lower extremities and was associated with numbness in his scrotum. *Id.* Plaintiff's thoracolumbar spine was moderately tender at the L4 disc space. Tr. at 393. Magnetic resonance imaging ("MRI") of his lumbar spine showed a left lateral disc bulge at L3-4 that displaced the lateral left L3 nerve root and a right foraminal bulge and annular tear at L4-5, without disc herniation. Tr. at 397–98.

On January 18, 2011, Plaintiff presented to St. Francis Hospital with a complaint of abdominal pain. Tr. at 383. He was diagnosed with abdominal pain, esophagitis, hiatal hernia, nonspecific gastritis, and nausea. Tr. at 385.

Plaintiff presented to William Brener, M.D. ("Dr. Brener"), for a consultation regarding abdominal pain on January 19, 2011. Tr. at 409–11. He reported daily epigastric pain and diarrhea with about ten mushy or watery bowel movements ("BMs") during the day and five or six during the night. Tr. at 411. He indicated his appetite was decreased and that he was experiencing fatigue. *Id.* Dr. Brener observed Plaintiff to have mild epigastric tenderness on examination. Tr. at 410. He indicated Plaintiff had numerous gastrointestinal ("GI") symptoms that were more likely somatic than organic. Tr. at 409. He recommended Plaintiff follow up with Dr. Shoemaker for treatment of depression, which he believed to be Plaintiff's major underlying problem. *Id.*

On January 26, 2011, Dr. Brener indicated Plaintiff's upper endoscopy was normal except for mild reflux esophagitis and a mildly irregular Z-line. Tr. at 408. He stated

biopsies were consistent with reflux. *Id.* He also noted that Plaintiff had a two centimeter hiatal hernia. *Id.*

Plaintiff presented to Douglas H. Gleaton, M.D. ("Dr. Gleaton"), on January 27, 2011, and reported that he had run out of his medications. Tr. at 616. Dr. Gleaton refilled Plaintiff's prescriptions. *Id.*

Dr. Brener indicated Plaintiff continued to complain of epigastric knot-like pain on January 27, 2011, but noted that it decreased in frequency. Tr. at 407. Plaintiff indicated he continued to have some loose BMs, but he denied watery BMs and stated he was moving his bowels about twice a day. *Id.*

On February 1, 2011, Dr. Brener noted that a recent computed tomography ("CT") scan of Plaintiff's abdomen and pelvis revealed fatty liver, but no other significant abnormalities. Tr. at 406. Plaintiff's blood work was abnormal. *Id.* Dr. Brener recommended Plaintiff take folic acid and schedule additional blood work and a colonoscopy. *Id.*

Plaintiff presented to the ER at St. Francis Hospital on February 6, 2011, with complaints of a headache and tingling in his pelvic area. Tr. at 640. He had full range of motion ("ROM") and no motor deficits. Tr. at 642. Morris Gitter, M.D., indicated that Plaintiff's headache was likely sinus-related and prescribed an antibiotic for sinusitis and Percocet for pain. *Id.* The discharge record indicates Plaintiff had an unsteady gait and difficulty walking. Tr. at 646.

On February 9, 2011, an MRI of Plaintiff's lumbar spine showed disc desiccation and mild disc space narrowing at L3-4. Tr. at 371. Plaintiff had a broad-based extension

of the disc posterolaterally to the left with an associated annulus tear that impinged upon the exiting left L3 nerve root and caused moderately-severe inferior left L3 neural foraminal narrowing. *Id.* The MRI also revealed a broad-based extension of the disc bulging posteriorly or posterolaterally to the left at L4-5, with mild left-sided thecal sac impression and moderate narrowing toward the inferior aspect of the left L4 neural foramen without significant compromise of the left L4 nerve root. *Id.* This finding reflected a worsening since April 7, 2010. *Id.*

On February 15, 2011, Dr. Brener indicated Plaintiff's recent colonoscopy was normal except for a one centimeter umbilicated lesion that had not grown in size since it was first discovered in August 2009. Tr. at 405. Plaintiff had small internal hemorrhoids, but biopsies throughout his colon were negative. *Id.*

Plaintiff presented to the ER at Roper Hospital with acute abdominal pain on April 22, 2011. Tr. at 482. A CT of his abdomen was unremarkable. Tr. at 492.

Plaintiff followed up with Dr. Brener on May 9, 2011. Tr. at 519–20. He stated he experienced nausea once or twice a week, but had only vomited once since his last visit. Tr. at 520. He indicated he was having four to five BMs during the daytime and four to five during the night. *Id.* Dr. Brener indicated the etiology of Plaintiff's diarrhea and abdominal pain remained unclear, but could be related to post-cholecystectomy state, diabetes, or irritable bowel syndrome ("IBS") related to depression. Tr. at 519. He indicated Plaintiff had not started taking folic acid and needed to do so. *Id.* He encouraged Plaintiff to follow up with Dr. Shoemaker regarding depression and diabetes. *Id.*

On May 16, 2011, Dr. Gleaton noted that Plaintiff had gastritis and depression. Tr. at 615. He increased Plaintiff's prescription for Metformin to address his elevated fasting blood sugars and prescribed Wellbutrin for depression. *Id.*

Dr. Brener completed a questionnaire regarding Plaintiff's mental state in May 2011. Tr. at 525. He indicated he had recommended Plaintiff follow up with Dr. Shoemaker for assessment of a possible affective disorder. *Id.* He described Plaintiff's mood/affect as depressed, but indicated his mental status was otherwise normal. *Id.*

State agency consultant Michael Neboschick, M.D., completed a psychiatric review technique form ("PRTF") on June 8, 2011. Tr. at 528. He considered Listing 12.04 for affective disorders, but found that Plaintiff's impairment was not severe. *Id.* He found that Plaintiff had mild restriction of activities of daily living, but no difficulties in maintaining social functioning, concentration, persistence, or pace and no episodes of decompensation. Tr. at 538.

State agency medical consultant William Cain, M.D., reviewed the evidence and assessed Plaintiff's physical residual functional capacity ("RFC") on June 9, 2011. Tr. at 542–49. He found that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour day; sit for a total of about six hours; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and never climb ladders/ropes/scaffolds. *Id.*

On June 28, 2011, Dr. Brener indicated Plaintiff's home fasting blood sugars ranged from 160 to 220, but that Plaintiff was unable to take insulin because he was a truck driver. Tr. at 614.

6

Plaintiff followed up with Dr. Brener on July 6, 2011. Tr. at 557. Dr. Brener indicated Plaintiff neglected to bring his medication to the appointment and was not very knowledgeable about the medications he was taking. *Id.* Plaintiff reported nausea that occurred twice a week and lasted for 15 to 20 minutes at a time and five to six BMs per day that were accompanied by cramping. *Id.* Dr. Brener recommended Plaintiff increase his dosage of Bentyl, obtain lab work, and provide a stool sample for pancreatic elastase testing. *Id.*

Plaintiff presented to the ER at St. Francis Hospital on September 27, 2011, with a complaint of back pain. Tr. at 632. He received a Toradol injection and prescriptions for Motrin, Ultram, and Flexeril. Tr. at 633, 636. He returned to the ER the next day and complained that his medications had not improved his symptoms and made him "feel funny." Tr. at 628. The attending physician diagnosed acute low back pain, chronic low back pain, and acute tonsillitis. Tr. at 631. He instructed Plaintiff to stop Tramadol, continue Flexeril and Motrin, and start Azithromycin. *Id.*

Plaintiff followed up with Dr. Brener on December 27, 2011. Tr. at 555. He reported that he had daily nausea, but that it did not last throughout the day. *Id.* He indicated his appetite was decreased and that he had lost a few pounds since his last visit. *Id.* He complained of heartburn two to three times per week and indicated he felt as if his food was stuck three or four times per month. *Id.* He described stabbing epigastric pain that lasted for a couple of hours per day. *Id.* He reported postprandial diarrhea that generally occurred four times during the day and four times at night, but may occur up to 15 times over a 24-hour period. *Id.* He indicated that he was seeking disability for low

back pain that radiated down his left leg. *Id.* Dr. Brener recommended Plaintiff increase Prilosec to twice a day and Prevalite to three times a day. *Id.* He suggested Plaintiff follow up with Dr. Gleaton regarding uncontrolled blood sugar. *Id.* He referred Plaintiff for additional lab work and recommended he repeat the stool sample for pancreatic elastase and obtain a gastric emptying study. *Id.*

Plaintiff followed up with Dr. Gleaton on December 28, 2011. Tr. at 611. He reported continued GI problems and chronic lower back pain. *Id.* Plaintiff admitted that he had not been adhering to his diabetic diet. *Id.* Dr. Gleaton observed Plaintiff to have normal motor strength and an intact sensory exam. *Id.* Plaintiff complained of sensitivity to palpation in his right upper quadrant and along his lumbar spine and right paraspinous muscles. *Id.* Dr. Gleaton increased Plaintiff's dosage of Metformin and continued his other prescriptions. Tr. at 612.

Plaintiff presented to the ER at St. Francis Hospital on February 5, 2012, complaining of back pain that radiated to his left leg. Tr. at 622. Morris Gitter, M.D., prescribed Dilaudid, Phenergan, and Valium and discharged Plaintiff. Tr. at 623–24.

Plaintiff presented to neurosurgeon Robert Morgan Stuart, M.D. ("Dr. Stuart"), for a consultation regarding low back pain on February 15, 2012. Tr. at 658–59. Dr. Stuart noted that Plaintiff appeared to be somewhat uncomfortable. Tr. at 658. Plaintiff demonstrated 5/5 strength in his upper and lower extremities. Tr. at 659. He had 2+ reflexes and his sensation was grossly intact to light touch throughout. *Id.* Dr. Stuart noted that the recent MRI showed evidence of foraminal disc herniation at the L3-4 level, which could be impinging on the exiting L3 nerve root, but that the remainder of the

study was unremarkable. *Id.* He further noted that the MRI showed "what could be a foraminal disc fragment causing stenosis at the L3 level." *Id.* He stated that this may explain Plaintiff's left lower extremity radicular symptoms, but would not likely explain his back pain. *Id.* He referred Plaintiff for an epidural steroid injection and physical therapy. *Id.* On February 22, 2012, Plaintiff received a lumbar epidural steroid injection. Tr. at 681.

Plaintiff presented to Bon Secours St. Francis Hospital for a physical therapy evaluation on February 27, 2012. Tr. at 687. He indicated that he could ambulate for three to five minutes at a time and used a straight cane. *Id.* Plaintiff had 20 percent flexion with increased pain, 40 percent right rotation with left-sided back pain, 40 percent side-bending with worsened left-sided back pain, 15 percent left rotation with worsened left-sided pain, and 15 percent left side-bending with worsened left-sided pain. *Id.* He was unable to extend his lumbar spine. *Id.* The physical therapist indicated Plaintiff would benefit from two physical therapy sessions per week over a 90-day period. Tr. at 688.

On March 16, 2012, state agency medical consultant Mary Lang, M.D. ("Dr. Lang"), reviewed the record and determined that degenerative disc disease was a severe impairment and that Plaintiff's nonsevere impairments included diabetes, migraines, and inflammatory bowel disease. Tr. at 50. Dr. Lang completed a physical residual functional capacity ("RFC") assessment and rated Plaintiff's exertional limitations as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about

six hours in an eight-hour workday; frequently climb ramps/stairs; occasionally climb ladders/ropes/scaffolds, stoop, kneel, crouch, and crawl; and avoid concentrated exposure to hazards. Tr. at 51–53.

Plaintiff followed up with Dr. Stuart on April 4, 2012. Tr. at 668–69. Dr. Stuart indicated Plaintiff had undergone an epidural steroid injection and a course of physical therapy since his last visit. Tr. at 668. Plaintiff stated that the steroid injection provided some relief for approximately three days, but that his pain and left lower extremity symptoms returned. *Id.* Plaintiff had normal motor strength and 2+ bilateral patellar reflexes. *Id.* Dr. Stuart assessed low back pain and lumbar radiculopathy. *Id.* He noted that Plaintiff's MRI was rather unremarkable and that the small foraminal disc herniation at L3 did not explain his complaint of significant low back pain. *Id.* He stated that he was not convinced that surgery to remove the small disc fragment would result in any improvement and recommended that Plaintiff pursue conservative treatment. *Id.* He referred Plaintiff to pain management specialist James R. Keffer, D.O. ("Dr. Keffer"), to discuss comprehensive nonoperative treatment strategies. Tr. at 668–69.

Plaintiff presented to Dr. Keffer on April 19, 2012, for an initial consultation. Tr. at 670–72. He described chronic low back pain with intermittent left lower extremity pain and paresthesias. Tr. at 670. Dr. Keffer observed Plaintiff to be tender to palpation of his lumbar spine, but to have normal ROM. *Id.* He indicated that Plaintiff's MRI suggested he may have some impingement on the left of the L3 nerve. *Id.* He stated Plaintiff had normal gait and intact heel-toe stance. Tr. at 671. He noted Plaintiff had 2+ bilateral patellar and Achilles reflexes and normal down going Babinski's reflex, but absent ankle

clonus. *Id.* Plaintiff had 5/5 motor strength, intact pinprick sensation, negative straight-leg raise, negative prone femoral stretch, and normal lower extremity tone. *Id.* Dr. Keffer assessed low back pain and lumbar radiculopathy and prescribed Tramadol. *Id.* He discussed with Plaintiff the etiology of his pain, his financial hardship, and the risk of addiction from long-term opiate use. *Id.* He recommended that Plaintiff avoid regular and prolonged use of narcotic medications. *Id.* He also strongly suggested that Plaintiff set a goal of returning to modified work instead of pursuing Social Security disability. *Id.*

Plaintiff followed up with Dr. Keffer on May 8, 2012. Tr. at 665. Dr. Keffer observed Plaintiff to be tender to palpation in his lumbar spine. *Id.* Plaintiff had normal ROM. *Id.* He had 2+ patellar and Achilles reflexes and 5/5 motor strength. Tr. at 666. Dr. Keffer noted that Plaintiff was sitting in a wheelchair. Tr. at 665. He observed that Plaintiff had a slow and slightly antalgic gait. *Id.* He assessed low back pain, lumbar radiculopathy, and insomnia and prescribed Tramadol. Tr. at 666. He indicated Plaintiff's financial hardship had prevented him from pursuing more physical therapy and filling his prescription for Tramadol. *Id.* He instructed Plaintiff to fill the prescription at Costco and to visit a public pool for swimming classes. *Id.*

On June 20, 2012, Plaintiff reported to Dr. Gleaton that he had recently been without his medications because of financial hardship. Tr. at 711. He complained of a constant burning sensation in his feet that extended up his legs and into his back and groin. *Id.* Plaintiff complained of abdominal pain, cramps, nausea, and diarrhea, but denied vomiting. Tr. at 712. Dr. Gleaton observed no abnormalities on examination. Tr.

at 711–12. He prescribed Metformin HCl extended release tablets and instructed Plaintiff to take two tablets twice a day. Tr. at 712.

On July 2, 2012, state agency medical consultant Cleve Hutson, M.D. ("Dr. Hutson"), determined that degenerative disc disease was a severe impairment and that diabetes, migraines, and inflammatory bowel disease were nonsevere impairments. Tr. at 72. Dr. Hutson rated Plaintiff's exertional limitations as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour day; sit for a total of about six hours in an eight-hour day; frequently climb ramps/stairs and balance; occasionally climb ladders/ropes/scaffolds, stoop, kneel, crouch, and crawl; and avoid concentrated exposure to hazards. Tr. at 73–76.

On August 28, 2012, Plaintiff reported to Dr. Gleaton that his blood sugar was fluctuating and causing headaches and fatigue. Tr. at 709. He also endorsed sinus headaches and pain in his low back and right arm. *Id.* Dr. Gleaton noted no abnormalities on examination. *Id.* He refilled Plaintiff's medications and referred him for lab work. Tr. at 710.

Plaintiff followed up with Dr. Gleaton on March 21, 2013. Tr. at 706. He indicated that he was taking two Metformin pills only once a day to make the medication last longer. *Id.* He stated he was not checking his blood sugar regularly because his glucose meter had malfunctioned. *Id.* He endorsed a constant burning sensation in his leg that occasionally extended from his feet to his back and through his groin. *Id.* He complained of ongoing back pain and indicated he was unable to work because he could not maintain

12

one position for an extended period. *Id.* He endorsed gas, cramps, abdominal pain, and diarrhea. Tr. at 707. Dr. Gleaton observed no abnormalities on examination. Tr. at 706–07. He indicated Plaintiff's diabetes was "out of control" and instructed Plaintiff to take Glimepiride and two Metformin pills twice a day. Tr. at 707. He referred Plaintiff for lab work and refilled his prescription for Cholestyramine Light packets for IBS. *Id.*

Plaintiff presented to the ER at Roper Hospital on July 30, 2013, complaining of low back pain. Tr. at 729. The attending physician observed Plaintiff to have a loss of normal lumbar lordosis and nonfocalized tenderness to the midline and surrounding musculature. *Id.* Plaintiff had 5/5 strength in all extremities and normal sensation. *Id.* The attending physician prescribed Flexeril and Norco and instructed Plaintiff to follow up with Dr. Gleaton in three to five days. Tr. at 730.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on September 11, 2013, Plaintiff testified he was 5'7" tall and weighed 218 pounds. Tr. at 32–33. He indicated he stopped driving a bus for work because he was in pain. Tr. at 35.

Plaintiff testified that he experienced a constant burning pain in his feet that radiates from his feet to his legs and back. Tr. at 36. He described it as feeling as if someone were stabbing him with a knife. Tr. at 40. He stated his pain had been treated with physical therapy, ice packs, electrical shock, heat, and epidural injections. Tr. at 36. He indicated he had consulted with two specialists and that one recommended surgery

and the other did not. Tr. at 36–37. He denied having insurance and indicated he was currently being treated with 800 milligrams of ibuprofen for pain. Tr. at 37.

Plaintiff testified that Dr. Gleaton treated him for back pain, diabetes, and migraine headaches. Tr. at 37. He indicated Dr. Gleaton had prescribed a cane and that he used it to walk in his home and outside. Tr. at 33. He confirmed that he was taking medication for diabetes, but indicated that his blood glucose fluctuated. Tr. at 37. He endorsed frequent migraine headaches and stated that they sometimes lasted for a week or two at a time. Tr. at 38. He stated he sometimes had difficulty focusing when he had a severe headache. Tr. at 40. He indicated his headaches were sometimes accompanied by stomach upset that required he visit the bathroom frequently. Tr. at 38. Plaintiff testified that his stomach problems caused him difficulty with eating and drinking and necessitated that he stay close to a bathroom. *Id.* He endorsed constant abdominal pain, but admitted that his medication reduced the pain most of the time. *Id.*

Plaintiff testified that he could sit for 15 to 30 minutes at a time. Tr. at 39. He stated that he alternated between sitting, standing, and lying down every 20 to 30 minutes. *Id.* He indicated he was unable to walk long distances and that his legs had given out twice while he was walking. Tr. at 39, 40.

Plaintiff stated that he lived with a female friend and her two adult children. Tr. at 31–32. He indicated his friend's son had special needs and that he had helped to care for him until his back pain worsened two years earlier. Tr. at 32. He testified that he had a 17-year-old son who sometimes visited him. Tr. at 32. He stated he attended a couple of his son's athletic events during the previous year. *Id.* He indicated he was in pain, but

stayed because his son wanted him there. *Id.* He stated that he no longer drove because his feet burned and he was uncomfortable in the seat. Tr. at 35. He indicated he tossed and turned during the night and visited the bathroom frequently. Tr. at 39. He denied doing household chores. *Id.* He stated his friend sometimes helped him to shave. *Id.*

b.    Vocational Expert Testimony

Vocational Expert ("VE") Tonetta Watson-Coleman reviewed the record and testified at the hearing. Tr. at 40–43. The VE categorized Plaintiff's PRW as a bus driver, *Dictionary of Occupational Titles* ("*DOT*") number 913.463-010, as requiring medium exertion and having a specific vocational preparation ("SVP") of four and a garbage truck driver, *DOT* number 905.663-010, as requiring medium exertion and having an SVP of three. Tr. at 41. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform sedentary work as defined in the *DOT*; was limited to pushing and pulling 10 pounds occasionally and five pounds frequently with the upper extremities; was unable to push or pull with the lower extremities; could occasionally climb ramps or stairs, stoop, and kneel; could never perform any other postural activities; should avoid exposure to hazards such as unprotected heights and dangerous, moving machinery; and required a sit/stand option at the work station every 30 minutes. *Id.* The VE testified that the hypothetical individual would be incapable of performing Plaintiff's PRW and that Plaintiff had no transferable skills to the sedentary exertional level. *Id.* The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified sedentary jobs with an SVP of two as a surveillance system monitor, *DOT* number 379.367-010, with 550 positions in

15

South Carolina and 74,470 positions in the national economy; a call out operator, *DOT* number 237.367-014, with 1,450 positions in South Carolina and 51,240 positions in the national economy; and a tube operator, *DOT* number 239.687-014, with 1,060 positions in South Carolina and 83,250 positions in the national economy. Tr. at 42. The ALJ asked the VE to further assume the individual described in the first hypothetical would require a cane to ambulate. *Id.* He asked if the individual would be able to perform the jobs identified in the first hypothetical. *Id.* The VE indicated the individual could perform the jobs. *Id.* The ALJ next asked the VE to assume the individual could not maintain persistence and pace on his work tasks for at least two hours at a time because of disruptions from pain. *Id.* He asked if the individual could perform any jobs. *Id.* The VE indicated that all jobs would be eliminated under that scenario. *Id.* The VE explained that the *DOT* did not address use of a cane or the sit/stand option, but that her responses were based on her professional experience and observation of the jobs. *Id.*

Plaintiff's attorney asked the VE to assume the individual would be off task during 15 percent or more of the workday secondary to frequent bathroom use. Tr. at 43. She asked if the jobs identified in response to the first hypothetical would still be available. *Id.* The VE testified that the specified limitation would eliminate all jobs. *Id.*

### 2.    The ALJ's Findings

In his decision dated October 23, 2013, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

16

2.      The claimant has not engaged in substantial gainful activity since February 19, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.      The claimant has the following severe impairments: degenerative disc disease, diabetes mellitus, migraine headaches, obesity, and irritable bowel syndrome (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of sedentary work activity as defined in 20 CFR 404.1567(a) and 416.967(a) with pushing and pulling with the upper extremities [limited to] 10 pounds occasionally and 5 pounds frequently, a sit/stand option at the workstation every 30 minutes, and the ability to use a cane when walking. The claimant cannot push or pull with the lower extremities; can occasionally climb ramps or stairs, stoop, and kneel but cannot perform other postural activities; and must avoid exposure to hazards such as unprotected heights and dangerous moving machinery.

6.      As a result of his residual functional capacity as described above, the claimant is unable to perform his past relevant work as a bus driver and garbage truck driver (20 CFR 404.1565 and 416.965).

7.      The claimant was born on February 24, 1967, and was 43 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45–49 (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from February 19, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 12–21.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ failed to develop the record to definitively determine whether he had spinal nerve impingement;

2)    the ALJ did not properly consider Plaintiff's treating physician's opinion;

3)    the ALJ failed to consider the combined effect of Plaintiff's impairments; and

4)    the ALJ did not adequately consider Plaintiff's subjective reports regarding the frequency and urgency of his need to use the bathroom.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983)

(discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Duty to Develop the Record

Plaintiff argues that the ALJ's decision is not supported by substantial evidence. [ECF No. 13 at 13]. He contends that the ALJ was obligated to determine whether he had nerve root impingement, but failed to obtain additional information to resolve the uncertainty. *Id.* at 14–15.

The Commissioner argues that Plaintiff carried the burden to develop the record and that the ALJ had no duty to order a consultative examination. [ECF No. 15 at 13–14]. She contends the ALJ reviewed the evidence of record and determined that a consultative

examination was unnecessary because she had sufficient evidence to determine Plaintiff was not disabled. *Id.* at 14.

"[T]he ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on the evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173, citing *Walker v. Harris*, 642 F.2d 712, 714 (4th Cir. 1981); *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980). To fulfill this duty, the ALJ may refer a claimant for a consultative examination to resolve inconsistencies in the evidence or when the medical evidence is insufficient to allow the ALJ to make an informed decision on the claim. 20 C.F.R. §§ 404.1519a(b), 416.919a(b). The SSA may purchase consultative examinations to obtain clinical findings, laboratory tests, diagnoses, or prognoses under the following non-exclusive circumstances:

(1) The additional evidence needed is not contained in the records of your medical sources;

(2) The evidence that may have been available from your treating or other medical sources cannot be obtained for reasons beyond your control, such as death or noncooperation of a medical source;

(3) Highly technical or specialized medical evidence that we need is not available from your treating or other medical source; or

(4) There is an indication of a change in your condition that is likely to affect your ability to work, but the current severity of your impairment is not established.

*Id.*

The ALJ found that Plaintiff's impairment did not meet or equal Listing 1.04 and stated the following:

the weight of the evidence of record fails to indicate that the claimant suffers from degenerative disc disease resulting in compromise of a nerve root (including the cauda equina) or the spinal cord with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or lumbar spinal stenosis resulting in pseudoclaudication.

Tr. at 13–14. She noted that the February 2011 MRI indicated possible nerve root impingement, but that examinations failed to show motor or reflex loss or limitation of motion of the spine. Tr. at 14. She later indicated that Dr. Stuart noted that the L3-4 disc herniation "could" be impinging on the exiting L3 nerve root. Tr. at 18.

It was unnecessary for the ALJ to refer Plaintiff for a consultative examination to resolve inconsistencies in the evidence. Plaintiff was already examined by two specialists who concluded that the MRI and examination findings neither conclusively proved nor ruled out nerve root impingement at L3. *See* Tr. at 659, 670. There was no inconsistency in the record regarding whether Plaintiff had nerve root impingement because both treating physicians found that the available evidence failed to provide certainty. Furthermore, if a consultative physician opined with certainty that the disc herniation impinged on the L3 nerve root, it would create a conflict in the evidence. The ALJ would then have to decide whether to accept the consultative physician's opinion that the disc herniation was causing nerve root impingement or the opinions of the treating physicians

that it was unclear from the imaging studies whether the disc herniation impinged on the L3 nerve root.

Plaintiff seems to confuse the ALJ's obligation to resolve inconsistencies with a nonexistent duty to obtain a definitive diagnosis. "While the ALJ must make a reasonable inquiry into a claim of disability, he has no duty to 'to go to inordinate lengths to develop a claimant's case.'" *Craft v. Apfel*, 164 F.3d 624, 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam) (unpublished table decision), citing *Thomas v. Califano*, 556 F.2d 616, 618 (1st Cir. 1977). Had the ALJ referred Plaintiff to a consultative physician, that physician—like Dr. Stuart and Dr. Keffer—might have concluded that the evidence did not conclusively show whether Plaintiff had nerve root impingement. Under Plaintiff's theory, the ALJ would have had to continue to refer him to physicians until one could declare that he either had or did not have nerve root impingement. This seems a much more onerous burden than that contemplated in 20 C.F.R. §§ 404.1519a(b) and 416.919a(b).

The undersigned further recommends the court find that the medical evidence was sufficient to allow the ALJ to make an informed decision. The ALJ found that Plaintiff's impairment did not meet the severity requirements in Listing 1.04. Tr. at 13–14. Listing 1.04 provides as follows:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy

with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App'x. 1, § 1.04. Although a finding that an individual is disabled under Listing 1.04 requires that the individual have compromise of a nerve root or the spinal cord, it also requires that additional criteria be met. *See id.* The ALJ's finding that Plaintiff did not meet Listing 1.04 was not based on the inconclusive evidence of nerve root impingement, but, rather, on the fact that the evidence did not indicate that he met the criteria under paragraph "A," "B," or "C." *See* Tr. at 14 ("Although the claimant's MRI from February 2011 indicated possible nerve root impingement, his examinations have failed to show motor or reflex loss or limitation of spine motion. Also, his examinations have failed to show that this impairment suffers from an inability to perform fine and gross movements or disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements or gait and station as defined in Listing 1.00B2c and 1.00B2b, respectively. Exhibits 3F, 15F, 16F and 18F."). Thus, the ALJ determined that whether or not Plaintiff had nerve root impingement was inconsequential because the totality of the evidence did

not suggest that his impairment met the criteria for a finding of disability under Listing 1.04.

The ALJ further concluded that whether or not Plaintiff had nerve root impingement was irrelevant to an overall determination of whether he was disabled because the record generally showed unremarkable physical and neurological findings, and his physicians recommended he pursue conservative treatment. *See* Tr. at 18 (citing a February 2012 examination that showed Plaintiff to have full ROM, normal gait, and intact strength and sensation; noting that Plaintiff had a slow and antalgic gait, but intact strength and sensation in May 2012; indicating that follow up treatment records failed to reveal any continued gait disturbance or any loss of sensation, muscle tone, or strength). Thus, it appears that the ALJ relied on the evidence of record to support her decision and that no additional evidence was required for the ALJ to make an informed decision regarding the effects of Plaintiff's degenerative disc disease.

### 2. Treating Physician's Opinion

Dr. Gleaton completed a questionnaire regarding Plaintiff's mental abilities on December 30, 2011. Tr. at 724–26. He indicated Plaintiff had lumbar disc disease. Tr. at 724. He stated Plaintiff could tolerate work for less than one hour without interruption and for one to two hours total during an eight-hour day. Tr. at 724. He indicated he did not believe that Plaintiff could work on a consistent and sustained basis because of lumbar disc disease. *Id.* He stated Plaintiff's medications caused lethargy. *Id.* He described Plaintiff as unlimited in his abilities to follow work rules, relate to coworkers, deal with the public, use judgment, interact with supervisors, deal with work stress,

function independently, and maintain attention and concentration. Tr. at 725. He stated

Plaintiff could understand, remember, and carry out complex job instructions, detailed

job instructions that were not complex, and simple job instructions. *Id.* He indicated

Plaintiff had unlimited abilities to maintain personal appearance, behave in an

emotionally stable manner, relate predictably in social situations, and demonstrate

reliability. Tr. at 725. Finally, he stated that Plaintiff had been or was expected to be

unable to work on a consistent basis for at least 12 months in a row. Tr. at 726.

Plaintiff argues the ALJ erred in rejecting Dr. Gleaton's opinion and failed to cite

adequate information to support her decision. [ECF No. 13 at 18–19]. He maintains that

because the ALJ gave no weight to the state agency consultants' opinions and little

weight to Dr. Gleaton's opinion, she impermissibly relied on her own nonmedical

opinion. [ECF No. 16 at 4].

The Commissioner argues the ALJ reasonably weighed Dr. Gleaton's opinion.

[ECF No. 15 at 15]. She maintains Dr. Gleaton's opinion was on an issue reserved to the

Commissioner. *Id.* at 16. She contends Dr. Gleaton failed to support his opinion with any

objective evidence. *Id.* at 17.

The Social Security Administration's ("SSA's") regulations require that ALJs

carefully consider medical source opinions of record. SSR 96-5p. ALJs must accord

controlling weight to the opinions of treating physicians that are well-supported by

medically-acceptable clinical and laboratory diagnostic techniques and that are not

inconsistent with the other substantial evidence of record. 20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2). If the ALJ determines that the treating physician's opinion is not entitled

to controlling weight, she is required to evaluate the treating physician's opinion and all other medical opinions of record based on the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c). *Id.*; SSR 96-2p. The relevant factors include (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his or her own treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. §§ 404.1527(c), 416.927(c).

A treating source's opinion generally carries more weight than any other opinion evidence of record, even if it is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). Medical opinions that are adequately explained by the medical source and supported by medical signs and laboratory findings should be accorded greater weight than uncorroborated opinions. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). "[T]he more consistent an opinion is with the record as a

whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F.

App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d) (2004).[4]

This court should not disturb the ALJ's weighing of the medical opinion evidence

of record "absent some indication that the ALJ has dredged up 'specious inconsistencies,'

*Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason

for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998

WL 702296, at *2 (4th Cir. 1998) (per curiam). ALJs are not required to expressly

discuss each factor in 20 C.F.R. §§ 404.1527(c) and 416.927(c), but their decisions

should demonstrate that they considered and applied all the factors and accorded each

opinion appropriate weight in light of the evidence of record. *See Hendrix v. Astrue*, No.

1:09-1283-HFF, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010).

The ALJ considered Dr. Gleaton's opinion, but accorded it little weight because it

was "unsupported by the weight of the evidence of record." Tr. at 17.

The undersigned recommends the court find the ALJ adequately considered Dr.

Gleaton's opinion in light of the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c) and

cited substantial evidence to support her decision to give it "little weight." The ALJ

acknowledged Dr. Gleaton's status as an examining and treating physician. *See* Tr. at 17.

However, she found that Dr. Gleaton's opinion was not supported because neither his

treatment records nor the medical evidence as a whole supported the restrictions he

advanced. *See id.* She pointed out that Dr. Gleaton's opinion was inconsistent with

---

[4] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. § 416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

unremarkable physical, neurological, and mental status examinations and an absence of documentation of excessive daytime hypersomnolence and complaints from Plaintiff regarding side effects from his medications. *See id.* The ALJ subsequently discussed the unremarkable physical findings from other physicians in greater detail. *See* Tr. at 18. Thus, the ALJ relied on persuasive contrary evidence to discount the opinion of Plaintiff's treating physician—finding that the opinion was not supported by Dr. Gleaton's observations and was inconsistent with the other medical evidence of record.

The undersigned further recommends the court reject Plaintiff's argument that the ALJ's RFC finding was improper because it reflects none of the medical opinions of record. "Courts have generally held that 'where there is no competing evidence, the ALJ is not permitted to substitute his opinions for those of the examining doctors.'" *Shipman v. Colvin*, No. 5:14-2700-DCN, 2015 WL 5691870, at *6 (D.S.C. Sept. 28, 2015), citing *Rogers v. Colvin*, No. 5:12-2979, 2014 WL 658002, at *8 (D.S.C. Feb. 19, 2014) (collecting cases). However, the ALJ explained that competing evidence prevented her from adopting the opinions of Dr. Gleaton and the state agency physicians. *See* Tr. at 17. She stated that she gave little weight to Dr. Gleaton's opinion because it was unsupported by his treatment notes and inconsistent with the findings of other medical providers. *See id.* She indicated she gave no weight to the state agency physicians' opinions because she gave some credit to Plaintiff's subjective complaints. *See id.* Thus, the ALJ did not discount the medical opinions of record based on her own opinion, but did so based on the entirety of the evidence. *See Dellinger v. Colvin*, No. 6:14-1150-DCN, 2015 WL 5037942, at *7 (D.S.C. Aug. 26, 2015).

30

### 3.     Combined Effect of Impairments

Plaintiff argues the ALJ did not consider the evidence of record that suggested his GI symptoms were caused by depression. [ECF No. 13 at 11]. He maintains the ALJ stated in the decision that she considered the combined effect of his impairments, but that she failed to explain how she considered the causal connection between his depression and his GI symptoms. *Id.* at 12. He contends the ALJ also failed to consider that his impairments and his medications caused chronic fatigue. *Id.*

The Commissioner argues that the decision as a whole shows that the ALJ adequately analyzed the combined effect of Plaintiff's multiple impairments. [ECF No. 15 at 11]. She maintains that the ALJ concluded that the combined effect of Plaintiff's impairments did not satisfy a Listing and that the record evidence of GI symptoms was minimal and did not require repeated discussion at step three. *Id.* at 11–12. She contends the ALJ "necessarily" considered Plaintiff's impairments in combination in determining his RFC because "the RFC assessment represents the most a claimant can still do despite her limitations." *Id.* at 12.

When a claimant has multiple impairments, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of all those impairments in determining the claimant's RFC and his disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated the importance of the ALJ's explaining how he evaluated the combined effect of a claimant's impairments). The Commissioner

31

must consider the combined effect of all of the individual's impairments "without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(b)(2)(B) (2004). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.* This court subsequently specified that "the adequacy requirement of *Walker* is met if it is clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments." *Brown v. Astrue*, C/A No. 0:10-CV-1584-RBH, 2012 WL 3716792, at *6 (D.S.C. Aug. 28, 2012), *citing Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995)).

The ALJ found that Plaintiff's severe impairments included degenerative disc disease, diabetes, migraine headaches, obesity, and IBS. Tr. at 12. She determined that depression was not a severe impairment. Tr. at 13. She stated that she considered the combined effect of Plaintiff's impairments and determined that the findings related to them were not at least equal in severity to those described in the Listings. Tr. at 13–14. She found that Plaintiff was limited to sedentary work with limited pushing, pulling, and postural activities and a sit-stand option because of his diabetes and degenerative disc disease. Tr. at 18. She stated she limited Plaintiff to sedentary work to accommodate his GI symptoms. Tr. at 19. She stated that Plaintiff's obesity had no negative effect on his ability to perform routine movement beyond the limitations set forth in the RFC. *Id.*

A review of the evidence lends little support to Plaintiff's argument that the ALJ did not consider his GI symptoms in combination with depression. Although Dr. Brener

initially opined that Plaintiff's GI symptoms were more likely somatic than organic in origin, he later concluded that the source of Plaintiff's GI symptoms was unknown and could be a product of his post-cholecystectomy state, diabetes, or IBS related to depression. *Compare* Tr. at 409 (Dr. Brener's impression during the initial visit), *with* Tr. at 520 (Dr. Brener's impression after reviewing lab work and additional records). The ALJ's conclusion that the record documents very few complaints and limitations related to depression appears to be supported by substantial evidence. *See* Tr. at 13. Although Dr. Gleaton diagnosed depression on May 16, 2011, subsequent records contain no complaints from Plaintiff regarding depressive symptoms or treatment for depression. *Compare* Tr. at 615 (diagnosing depression and prescribing Wellbutrin on May 16, 2011), *with* Tr. at 611–12 (indicating no reports of depressive symptoms from Plaintiff and no reference to depression as an active problem or depression medication as an active prescription on December 28, 2011), 659 (describing Plaintiff as having an appropriate mood and affect on February 15, 2012), 706–08 (referencing no depression on March 21, 2013), 709–10 (failing to mention depression on August 28, 2012), 711–12 (recording no depression on June 20, 2012), 725 (describing Plaintiff's mental abilities to follow and complete directions, interact with others, and perform other work-related tasks as "unlimited" on December 30, 2011). Therefore, the undersigned does not find that the ALJ erred in his consideration of depression or the combined effect of depression and GI symptoms.

Nevertheless, it appears that the ALJ failed to adequately consider the combined effect of Plaintiff's GI impairments and diabetes. The record contains evidence of fatigue

as a result of GI problems and diabetes, and the ALJ failed to consider these impairments in combination in assessing Plaintiff's RFC. *See* Tr. at 411 (complaining of fatigue as a result of GI symptoms), 519 (indicating that GI symptoms may be related to his diabetes), 709 (noting fatigue from uncontrolled blood glucose). In light of the foregoing, the undersigned recommends the court find the ALJ failed to adequately consider the combined effect of Plaintiff's impairments.

### 4.    Subjective Complaints

Plaintiff argues that the ALJ erroneously concluded that the evidence of record did not address the frequency of his bathroom use. [ECF No. 13 at 15–18]. He maintains that because he had impairments that could reasonably require urgent and frequent bathroom use, the ALJ should have accepted his subjective reports. *Id.* at 16–18. In his reply to the Commissioner's brief, Plaintiff cites specific treatment notes referencing abdominal pain, diarrhea, frequent BMs, and other GI complaints. [ECF No. 16 at 2–3].

The Commissioner argues that the ALJ was not required to adopt Plaintiff's testimony regarding the frequency of his bathroom breaks. [ECF No. 15 at 14 n.2]. She maintains that the record reflects no complaints about excessive bathroom use. *Id.*

In considering the symptoms that a claimant alleges result from his impairments, the ALJ should first "consider whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7p. After determining that the individual has a medically-determinable impairment that could

reasonably be expected to produce the alleged symptoms, the ALJ should evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the limitations they impose on his ability to do basic work activities. *Id.* If the claimant's statements about the intensity, persistence, or limiting effects of his symptoms are not substantiated by the objective medical evidence, the ALJ should assess the individual's credibility in light of the entire case record. *Id.* The ALJ must consider "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id*

The ALJ must specify her reasons for the finding on credibility, and her reasons must be supported by the evidence in the case record. *Id.* Her decision must clearly indicate the weight she accorded to the claimant's statements and the reasons for that weight. *Id.*

The ALJ acknowledged Plaintiff's testimony that he required frequent and sudden bathroom breaks. Tr. at 15–16. She indicated that medical records "fail to evidence any significant weight loss or excessive daytime hypersomnolence despite the claimant's complaints of such frequent toileting and difficulty sleeping." Tr. at 16, 18. She stated "[t]he claimant's testimony regarding his gastrointestinal problems and bathroom frequency are not reported in the medical evidence of record." Tr. at 16. She noted that Dr. Brener indicated in January 2011 that he felt Plaintiff's GI symptoms "were more somatization than organic." Tr. at 18. She noted that the objective findings were generally

unremarkable. Tr. at 18–19. Finally, she stated that she had limited Plaintiff to sedentary work to accommodate his GI symptoms. Tr. at 19.

Having determined that Plaintiff had medically-determinable impairments that could reasonably be expected to the cause the GI symptoms that he alleged, the ALJ was required to evaluate the entire record to determine if Plaintiff's reported symptoms were credible. *See* SSR 96-7p. The undersigned's review of the record suggests that the ALJ overlooked evidence regarding the frequency and urgency of Plaintiff's bathroom use. The ALJ incorrectly specified that the GI problems and bathroom frequency that Plaintiff testified to were not documented in the medical records. *See* Tr. at 16. However, the record contains multiple references to frequent bathroom use and other GI complaints. *See* Tr. at 411 (reported epigastric pain with 10 watery BMs during the day and five or six during the night on January 19, 2011), 520 (endorsed some nausea and indicated he was having five or six BMs during the day and four to five at night on May 9, 2011), 555 (reported daily nausea and stabbing epigastric pain that lasted for a couple of hours per day on December 27, 2011; indicated he had diarrhea approximately four times during the day and five times at night, but up to 15 times over a 24-hour period), 557 (complained of five to six BMs per day that were accompanied by cramping on July 6, 2011), 611 (endorsed GI problems on December 28, 2011), 707 (reported gas, cramps, abdominal pain, and diarrhea on March 21, 2013), 712 (complained of abdominal pain, cramps, nausea, and diarrhea on June 20, 2012). Thus, the ALJ discounted Plaintiff's credibility regarding the frequency and urgency of his need to use the bathroom based upon an inaccurate review of the record, and substantial evidence does not support her

decision to discount Plaintiff's credibility regarding the frequency and urgency of his need to use the bathroom.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

March 9, 2016                          Shiva V. Hodges
Columbia, South Carolina              United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).